May it please the Court, In holding that the officer unlawfully extended the traffic stop, the District Court erred in three ways. First, the Court erred in holding that the traffic stop ended prior to the completion of license and computer checks. Second, the multiple visible modifications to the defendant's trailer amounted to reasonable suspicion. Third, the Court ignored numerous other facts that contributed to reasonable suspicion under the totality of the circumstances. Gentlemen, as to my first point, this Court's precedents are clear. In United States v. Brigham, this Court held that during a traffic stop, an officer is able to conduct multiple tasks. The officer can inspect the license and the registration, the officer can ask questions of the driver about or the occupants about their itinerary, where they're coming from, where they're going, what they're doing, and the officer can conduct license and computer checks. And all of those tasks are tied directly to the purpose of the traffic investigation. Here, the District Court found that the traffic stop ended at the 11 minute and 14 second point on Government Exhibit 1, that's the video of the traffic stop. And at the 11 minute and 14 second point, Corporal James Woody, a five-year veteran of the West Battery Sheriff's Office, is returning to his patrol car. And the District Court questioned him, and then on redirect, the government clarified, and that's at pages 237 and 238 of the record, whether or not Corporal Woody had initiated and completed his license and computer checks. And he clearly testified at page 238 that he had begun those checks, but that he had not received any results. Did he not begin the license check until that 11 minute mark? I mean, I've watched the video, and he's basically out looking at the trailer, talking to the defendant. It seems to me if he doesn't even start the license check until the 11 minute mark, that's not the typical stop where that would happen very early on. Well, Your Honor, Brigham tells us not to put a stopwatch on traffic stops. And he had not begun the license check until that point because he was asking questions about the defendant's itinerary, and then he was asking questions about this visibly modified vehicle. And the defendant was unable to clearly answer those questions, and so Corporal Woody would follow up. Asking about the modifications is really — that's going to the suspicion of drugs, which if there's reasonable suspicion of that, he can do, but it seems — I mean, the Supreme Court, as you know, says it really has to be tightly tied to the traffic stop itself until reasonable suspicion of drug trafficking develops. I would agree with that, Your Honor. The Supreme Court also notes that it also has to be tied to attendant safety concerns. And here we have a vehicle that the defendant says has low tire pressure, and the officer looks at the trailer, and he's a guy that uses this type of trailer, as he testified to, on a regular basis. He hunts with them. His dad owns one. He's very familiar with it. And this thing looks off to him. So I think his questions are both related to his reasonable suspicion of narcotics, but I think there also is a safety basis there, in that the State has an interest in people who are towing trailers down the highway, that that trailer is safe, that it's not going to fall off, that it's not going to have the diamond plate metal that he'd never seen fly off the back. What minute do you — what time during the stop do you think reasonable suspicion of the drug use developed? Because in watching it — I know there's this debate that he noticed the modifications the first time he passed the trailer or when he went back, but it's at least by the four-minute mark, from what I've seen, that he does notice the modifications. When do you think the suspicion of drug use was established, or drug trafficking? Well, Your Honor, I don't know that — that Corporal Woody has to find suspicion of drug trafficking specifically. He has to find suspicion, the government's position, of a hidden compartment. And he testified that very early on, as he exited his vehicle, he noticed the modified tailgate and that he was suspicious of that vehicle. And I think that brings us to my second point, which is the visible modifications to this vehicle. And when you look at the tailgate, that's what jumps out to Corporal Woody, and based on his training experience, it also jumped out, importantly, to Lieutenant Green, who has 24 years of experience and teaches classes on how to detect these types of compartments because he's been doing this for multiple decades. And when these gentlemen looked at that tailgate, it didn't make sense to them because the vehicle had been modified. And frankly, people modify their vehicles in innocent ways every day, right? I can add a turbo to my engine, I can paint my car a crazy color, I can make my fenders look different. Those are all innocent. And here, the defendant could modify his tailgate and that could be innocent. But in light of all the other facts about that trailer, Corporal Woody didn't believe that modification was innocent because the tailgate had been cut and re-welded. And he could see that, and it's clear in the video, in the pictures, because the reflective tape on the back of the trailer was covered. And when he looked at it, he could see that when the tailgate was lowered, the trailer was no longer roll-on, roll-off. So the question is, why would someone modify a vehicle to make it work less well? And that really piqued Corporal Woody's suspicion, and that's important, because when you look at some of the vehicle modification cases that this Court has examined, I think it's Lieutenant Green testified that he arrived one or two minutes following the initial traffic stop. One or two minutes? After the stop of the defendant's vehicle. After the stop? Yes, Your Honor. So he was there for the first ten minutes of the questioning? He was. He was sitting, he testified he was sitting in Corporal Woody's patrol car. Because if you watch the video, the camera moves, and Corporal... When an officer pulls, they've got to be able to look out for, they pull the truck over, they follow and correspond to the usual way to find a traffic stop, a traffic violation of some sort, put them over, then he questions for eleven minutes. Is that correct? It is, Your Honor. And during ten of those minutes, the officer who has some expertise in the hiding of drugs, etc., etc., contraband, is there, and he's sitting in his car, he can see the vehicle at issue. Is that right? It is, Your Honor. He had gotten out of his car and entered Corporal Woody's patrol car, which was parked in front. When did he first, he, Green, first notice the, any things about the truck, such as the alignment of a rear truck gate, as I recall it? I believe Lieutenant Green testified that he thought the tailgate was suspicious, but he didn't go out and personally inspect the vehicle until... He was sitting in his car to see that. Right. But what else did he later find that moved from, that didn't make him suspicious? So if you watch the video, you see Lieutenant Green exit the patrol car, and he walks up and down the vehicle, and he testified that he found the bed of the trailer to be too thick, that metal had been added to the top, which adds weight, but doesn't make the trailer work more effectively. So this alignment of the tailgate was just confirmatory of the earlier excessive depth of the bed itself? I think they all tie together, Your Honor. Sorry? I think all those factors kind of tied together. Yes, I understand you add them all up to get a conclusion. I'm trying to get the sequence in which this occurred, and while the time clock is running. I think the modified tailgate is the first thing that jumped out, and then when he went up and looked at the bed, he was able to confirm his suspicions about the bed and the metal on top. Well, you've only been talking six minutes. He talked to... The officer, 11 minutes went by before anything, much of anything happened, 10 minutes went high before Green even got out of his car. So what's that about? You could get a good bit of information in 10 minutes. Yes, Your Honor. I think Lieutenant Green was just in the car to provide backup. He testified that he didn't want to crowd the defendant and let Corporal Woody conduct the traffic stop on his own. I'm sorry, I didn't understand what you just said. Lieutenant Green testified that he did not want to crowd the defendant, have too many officers talking to him at the same time, and let just one officer interact with the defendant. Okay, so he talked to him for 10 minutes alone? Corporal Woody and the defendant spoke for 10 minutes alone, yes, Your Honor. Okay. Well, now, how long, at what point does the questioning become impermissible? At what point along the line, in your view, did that, how much, how long could he have taken that? 20 minutes? 30 minutes? Well, Your Honor, just like the officer in Brigham, Corporal Woody's questioning was a graduated response to emerging facts. And there certainly could come a time where an officer could be questioning someone on the side of the road for unrelated things that would be an unlawful detention. We made it quite clear that the questioning may not be pertinent to anything in particular. In other words, we don't try to gauge the questions that are put by the officer. We leave the officer's good judgment about what, maybe he wants to gauge them in a conversation. There are a lot of reasons why an officer may want to do that. But my concern, one of my concerns is that's a long time, when somebody's sitting on the side of the road and the officer's doing nothing but just talking to him. Was he out, was the driver of the vehicle out of the vehicle? He was, Your Honor. I assumed he was. He got out quickly. I mean, the officer asked him to step out. He did. And one of the reasons why the questioning here took so long is because Mr. Villafranco was unable to answer some of these questions effectively. When asked where he was going, he said, I'm going to Gonzales. And Corporal Woody said, well, what are you doing there, what are you going to go get? And they proceed to have a conversation where it becomes clear that Mr. Villafranco does not actually have an address, despite the fact that he's traveling four hours from Houston. And so Corporal Woody says, you know, you don't know where you're going. And then Mr. Villafranco goes back to the vehicle and keeps getting more and more paperwork, but is unable to give Corporal Woody kind of a logical explanation for where he's going, which is part of the government's third point, which is the number of other additional factors in addition to the visible vehicle modifications that supported reasonable suspicion in this case. Your Honor, the records show that the Be On The Lookout For was supported by, what precipitated the Bolo alert? Your Honor, the record is only that the officers received a Bolo of a license plate. And that's all it says? That's all it says. Be On The Lookout For, it's a good looking car, I mean, it has some basis of suspicion. Obviously, it's a possible carrier of drugs, that would be the most common thing. Right, but when Corporal Woody initiated that traffic stop, he knew only a license plate. And he, as the district court found, observed a traffic violation and initiated that stop. And when he went up to the vehicle, he observed a large suitcase in the back seat. And there's photos of that in the record. I wanted to ask you, you're talking about the length of the stop, which is what you lost on Bolo, so that makes sense. But I want to ask you about the stop itself, because the officer says there were two reasons for the stop. One, following too closely, two, I think the car went outside the lane. The video, as the district court found, doesn't really show that, but she ends up, the judge ends up finding that he observed it before the video started. What's the best record support for the officer saying that in the hearing? The district court found that Corporal Woody's testimony was truthful on that point. No, I know that, but what did the officer say, where can you point me to in the record where the officer said he saw these violations before the video went on, and that therefore they wouldn't be seen on the video? Your Honor, I don't have an exact record citation for you, but I know it was right at the start of his direct examination, because we proceeded directly to what was the basis for the stop. Well, I know he does say, well, you can't, you might not be able to see them outside the lane, but you can see the car swerving, moving, because it's back, and, well, I didn't really see that either, but do you think anything is shown in terms of the traffic stop on the video? Not really, Your Honor, because the, Corporal Woody testified that the way that traffic camera worked, or the way the camera in his car works is it's activated with the lights. Right. Right. So I think it's common in a lot of traffic stops that the actual violation is not observed because the lights are initiated following the. No, I understand that. I just didn't see clear testimony, though, from him saying that, but I understand the logic behind it. The things that Corporal Woody observed in the defendant's car also contributed to his reasonable suspicion, because when you combine his large suitcase with his story that he's going and coming back, a four-hour drive from Houston, which could be a day trip, could be done in a day, or maybe in overnight, he had what appears to be a multi-day amount of luggage, and additionally, he had security measures that Corporal Woody found suspicious, because the trailer had three locks. He had also locked both the safety chains and the trailer hitch itself, which, based on Corporal Woody's experience as a guy who uses these trailers, he found suspicious. And that's important because the Supreme Court, in our value, says that we have to give great weight to the training and specialized experience of these officers. To your experience, have you ever seen a police officer who has a BOLO alert identify an ID to the car, that's the subject of the alert, and not stop him? Corporal Woody, I believe Lieutenant Green testified that that had happened, in his experience. Sometimes they didn't stop him at all? If they did not have a traffic violation, no. I see my time is up. Thank you. I suppose you can always find a traffic offense if you just hang around long enough. Thank you, Counselor. They would if I were driving, I guess. Good morning, Your Honor. Good morning. May I proceed? Please. First of all, I'd like to just point out briefly on the standard of review. The Court looks at the District Court's findings of fact for clear error and the application of the law as reviewed de novo. I believe that the law is clear in this case. It's another prolonged detention case. This Court has ruled on many of these. I know that Judge Higginbotham has authored opinions on this issue. He's authored opinions on every issue, I think, by now. That's true. That's true, Your Honor. So, I mean, the test is clear about prolonged detention, and I believe that the District Court correctly applied the law to the facts. What changes from case to case, because the Fifth Circuit rules on so many of these prolonged detention cases, are the facts. And the law stays the same. It's just whether or not the District Judge applied the law correctly to this. How do you see the facts? Yes, sir. I'll focus on that. In this case, unlike some of the precedent the government relies on, first of all, you have an officer who receives a BOLO report from his supervisor, just a license plate and a description of a vehicle. He testified that once he got that BOLO, he was going to stop the vehicle, and he was going to search the vehicle. So, unlike most cases, here we have a drug interdiction officer who also testified . . . I can accept that. They wouldn't stop. But, if they follow a vehicle a while, it comes down to whether he, in fact, found some traffic violation. Many of the things that are traffic violations . . . Yes, sir. I know there's no pretext stop. They're pretty picky. What Corporal Woody did is he made up his mind, I'm going to stop him. And then he gets in the left lane, and your honors have watched the video, he stays in the left lane and blocks Villafranco Inn, where Villafranco can't move over. The car in front of him starts slowing down, and then the officer says, well, now it's following too closely, which is what he created. The vehicle, the trailer tire strikes the fog line maybe one time, just barely strikes the line, and apparently that's enough for a traffic violation. The district judge gave Corporal Woody the benefit of the doubt on that and found that there was a valid traffic stop. I disagree with that. I don't think there was. But, once he makes the traffic stop, he approaches the vehicle, he tells him, you passed a sign back there, 1001, 1002. There's no sign on the video. That didn't happen. The Corporal Woody is not very credible in his statement of what he says happened. He then immediately, approximately one minute into the stop, completely stops his investigation of the purpose of the initial traffic stop. From the one minute mark, he gets Mr. Villafranco out, and then he tells him, hey, that's a pretty tight trailer. He didn't see anything wrong with the trailer. Later, he said he noticed as he was walking to the trailer. I don't believe that was true either. He's looking for a reason to search the vehicle. He's manufacturing something that he can say is reasonable suspicion. The district... But doesn't the tape show, I mean, just three or four minutes in, he's up at the front talking to your client. Then he walks back. Doesn't the video show him looking pretty closely at the trailer at that point? Exactly. Yes, sir, Your Honor. What happens is... Just three or four minutes in, right? He's already completed the purpose of the stop. He has the driver's license. He makes no effort to go radio in, dispatch, to see if there are any open warrants. What he does is he... He hasn't given him a ticket yet. No ticket. But that's... So how would the traffic stop be complete if he hasn't run the license and given him a ticket three minutes in? Well, Your Honor, that's a good question. In my opinion, the officer, he testified that he's never written a ticket. He doesn't write tickets. That was his testimony. I don't write tickets. I'm a drug interdiction. I do searches. He testified, my intention from the beginning was to search this vehicle, and I was going to create a way that I could have a reason to search the vehicle. That was his testimony. So he says, you were following too closely back there, 1001, 1002. Okay, get out of the car. Let's go talk. And he pulls Mr. Villafranco. First thing he says, hey, that's a nice, tight trailer. Then he starts... He doesn't go to the vehicle to radio dispatch. He starts the fishing expedition. He starts picking at little, innocuous details. Hey, there's a metal floor here. Why do you have a metal floor? The welds look weak. Later he testified he doesn't know anything about welding. It doesn't look as if the tailgate would open flush if you open it. He didn't open the tailgate to see how the operation of the tailgate worked. He's... Oh, there were three locks on the chains, one lock on each chain and one lock on the receiver. So these issues, the district judge pointed to all of those in her findings and her rationale for granting the motion to suppress that all of these things could have been true with 1,000 different trailers. Nothing that the officer pointed to in and of itself was unique and couldn't have been true of any trailer going down the road on I-10. What about Greene? What about Officer Greene? Officer Greene apparently arrived and observed and moved the camera around. And then at some point after Corporal Woody went into the vehicle, which is I think around the 11-minute mark, he talked to Greene. He turned his audio off. Throughout the video, Corporal Woody turns his video off, I mean his audio off so he can't hear what they're saying. And then he turns it back on. But again, I believe that the decision had been made to search the vehicle and they were just looking for some excuse for... It may be, but the question is that Greene did find a basis for the search. Your Honor, what Lieutenant Greene did is he got out and operated a backscatter kind of density meter. But if you watch the video and if you've seen the photos, there were two channels. I don't know if they're natural voids that were part of the frame, but there are two cocaine was revealed. Those two voids run from the front to the back of the trailer, kind of toward the center of the trailer. And you can see on the video where Lieutenant Greene operates the backscatter density meter, he never goes over the area where the voids are. What did he testify to? He testified that he discovered anomalies, but it's a mystery what the anomalies could have been. We don't know if there were any anomalies or not. He said that there were anomalies. But my point is the anomalies, whatever he discovered, weren't the... What did the district court do with Greene's testimony? Your Honor, the district judge findings were that the stop had been prolonged prior to Lieutenant Greene's involvement in the stop. So I don't believe she addressed that portion of it. But she found that at the latest, at the 11-14 mark, that the purpose of the stop had been... Go back to the timeline again and put Greene in it. By the time Greene involved, she said that it had already expanded. When did Greene come... He sat in his car for some period of time. Yes, sir. Correct. When did Greene come back on the scene? I mean, was he engaged to start with his depth meter and all that? After the 15-minute mark, when Corporal Woody then sort of requests consent to search, and Mr. Villafranco acquiesces, they handcuff him, put him in the back of the patrol car. Then Lieutenant Greene starts doing the inspection. The two officers are on top of the trailer. They're under. They're crawling under. They're all over it. And then at some point between the 15-minute mark and the 45-minute mark, when they run the dog, so for approximately... Actually, it's 40-minute mark. For about 25 minutes, they're crawling all around the trailer looking. It was 25 minutes before he did his depth meter? It's during that 25 minutes at some point that Lieutenant Greene brings out a density meter, and Corporal Woody brings out a dog. And the dog doesn't alert. He says the dog was overwhelmed by the odor. How many of you did the time clock run out on him? When did it become excessively long? Interrogation. Well, Your Honor, the district court finds that at the 11-14 mark, the purpose of the initial stop has concluded, and so her focus is on what facts could have justified a prolonged detention at that point. And she makes a finding that Corporal Woody's assertions that Villafranco's demeanor were not supported or corroborated by the video. Some of the things he suggests about Villafranco trying to distract him away from the trailer aren't borne out by the video. Counsel opposite suggested that he was getting answers about destination, et cetera, that didn't make sense and add up. What's your view of that? What the district court found was that he... Looking at the length of the time, the time clock continues to run permissibly as long as an officer is getting answers that are suspicious, nonresponsive, et cetera, et cetera. Where you're going, he doesn't know. They're kind of the things that he might... And the district judge found that none of the responses were evasive or suspicious in any manner. His demeanor was not suspicious. None of that is borne out in the record. So then she focused... Places for the time clock to be extended because the answers were nonresponsive or in turn raised other problems. Actually, what the findings were by the district judge is that the responses were responsive, that there was no nervousness, that there was no evasiveness, that there was nothing in his demeanor that would support reasonable suspicion for those first 11 minutes. So she looks at the other issue that the government would rely on, which is anomalies with the trailer, and she points to each one of the suggested anomalies and says there's not really anything suspicious about that. And then she cites the Madrigal opinion where it's an older model vehicle and the officer in that case pointed to some of the... Actually, the Madrigal opinion of all of these prolonged detention cases, I think, is the closest on point to the facts we have. There were no modifications to the vehicle observed in that case, right? In Madrigal? Right. No, sir. Can you cite us a case where officers had observed modifications and yet the court still found there was no reasonable suspicion of drugs being in those compartments? Can I cite one? Right. Is there a case out there that says that? I can't cite one, Your Honor, but I can tell you that what Judge Dick did in this case is she found that there were no modifications to that trailer. That trailer was ordinary. Counsel, isn't that an errant fact-finding? I don't know if it's a fact-finding that we have to review and can't overturn because it's not errant enough, but it does seem to me, based on the expertise of these witnesses, the modifications, I mean, you have a response to it, but their suspicions were aroused by the nature of these modifications. Well, you have a drop-down ramp that no longer is nearly as usable as it would have been if it had been in the place that it should have been or if the floor had not been raised, whatever caused the alteration. She looked at those factual statements by the officer or officers and rejected them. Is this court in a position under our review standard to look at those same modifications and say we see them much more as a basis for suspicion than Judge Dick did and we think that therefore the detention can extend beyond that? My response, Your Honor, would be that the court gives great deference to the findings of fact of the district judge and reviews the case giving . . . Well, she didn't have any facts that said modifications like this are in trailers every day, which is more or less what she found. These are the kinds of unsuspicious modifications a lot of trailers have. There was no facts to support that, so at least there she was speculating. Your Honor, the issue with the tailgate, for example, that was cited as a possible reason for suspicion, the tailgate wasn't lowered to determine whether or not it functioned properly until much later, long after the district judge . . . Well, it seemed like even in the upright position, you could tell where the floor of that would be if lowered. I don't know if the officer said that. I asked Corporal Woody, did you check to see the operation of the tailgate to see whether it was the type that goes down and then lifts in like a U-Haul trailer where you pull the ramp down and then you lift it up and clip it on? He said, no, not until long after did they check the ramp. I believe that reviewed in the light most favorable to the prevailing party, which is the standard of review, that the district judge's facts should be dispositive here. I think that she did a very thorough job of listing each fact as far as the prolonged detention, the reasonable suspicion, the consent, whether or not the consent was voluntary. She found that it was, but then she went on to list the other factors that would determine whether or not the consent was tainted. What did the district court do with the officer's testimony in asking questions about his destination and what he was doing? He explained that he was involved in the purchase of a crawler, and they talked about the price of the crawler, and the price was just kind of off the wall. If you know anything about heavy equipment, that makes sense. What I'm getting at is that the district court seemed to find— you say the district court found that all that testimony was straight. The conversation questioning did not arouse suspicion. But as I read the excerpts of the testimony, he was talking about a— he was telling a story that didn't make sense. He didn't know exactly where he was going, but he was going to buy this equipment and he was paying the price he was going to pay for it and so forth. It didn't hang together. I wouldn't know what the price would be. He told the officer that he was going to a particular town to pick up a crawler. He didn't have the address. Something to do with the crawlers. I don't believe that he is not having an address memorized of a place where he's going. He went to look for the paperwork to give the officer the address where he was going. He just didn't have it memorized. Yes, the district judge didn't find that to arise to the level— Was there evidence of what the paperwork showed? Did he actually have any paperwork that showed an address in Gonzales? We didn't get to that point in the detention, Your Honor. The officer just turned his attention to the trailer and never really— He went back to the vehicle but never produced any paperwork that was looked at by the officer? I don't believe so. It's not in the record, Your Honor. The officer didn't do that. He just turned his attention to the trailer and didn't follow up with what Biafranco was telling him about. He was on his way to this town to buy a crawler that he had gotten from salvagesales.com. He had paperwork that showed a $1,500 price for this. But he also submitted that the equipment of that type normally sold for $12,000. I don't know that, Your Honor. I can tell you that— I don't either. I'm just saying that's what the—as I read the materials in this record, that's what— You can get good deals— The trial court didn't address that. That seems to me to be a basis for an officer to be more than aware of this fellow's lying about what he's doing. Again, Your Honor, I can't attest to price or whether or not Mr. Biafranco was just getting a good deal from salvagesales.com. You can go on Craigslist or Trash to Treasure. There are all kinds of generators and equipment for sale used that you can get good deals. But based on the totality of the circumstances here, Your Honor, I believe given the fact that Corporal Woody admitted that he was going to create and manufacture a basis to stop the vehicle and search it— In other words, you can follow a person as long as you, in fact, find some violation. I agree, Your Honor. The fact that you would never have stopped the guy except for that violation doesn't matter. Yes, sir. You're right. That was just the first point in the totality of the circumstances. I was going to list several. It is just the first point, but it is the first one. It shows what the officer was really trying to do here, what his agenda was. And then when he does a questionable traffic stop, within a minute or so he leaves the traffic stop and starts the fishing expedition, starts trying to list things that the district judge found to be neutral that she believed didn't rise to the level of reasonable suspicion to prolong the detention. Then she found, again, that the consent was tainted by that unlawful detention. I believe that all of that is supported by the record and with the standard of review. Did the government meet their burden of proof at the suppression hearing? The judge found that they did not. On appeal, was the judge clearly erroneous? The judge was not clearly erroneous. These facts viewed in the light most favorable to the prevailing party, I believe, support this court's holding that the district judge did not err and that her granting of the motion to suppress should have been granted and the ruling should be affirmed. Thank you. All right, counsel. Thank you. Judge Costa, I think you've kind of pointed to an issue that the government really flagged in the district court's ruling, and that's the court's reliance on United States v. Madrigal. And that case is clearly distinguishable from this case because Madrigal is not a vehicle alterations case. It's not a case that involves a truck that has, or a trailer in this case, that has been visibly altered in some way. But what this court does have is a long line of cases in Ascensio, Estrada, and United States v. BAMS, all of which have facts in them that suggest a hidden compartment. And every single time the court finds that those modifications, and in BAMS the court recently said that the visible modifications that suggest a hidden compartment were the most important factor, that those visible modifications support reasonable suspicion and even probable cause to search. I don't think there's much question but that the modifications would provide reasonable suspicion. The difficulty is whether that came too late. The counsel opposite, as he rolls in on that, said that that came after, long after. It already held about 25 or 30 minutes or something. Well, Your Honor, I think the timeline here is crucial, and I would disagree that it came long after. Corporal Woody asked a number of questions about the trailer that demonstrate that he had questions about the trailer itself, and they were combined with the questions about— I thought Green didn't get out and offer his expertise until well after 25 minutes or so. Help me by the time on that. That was around the 12-minute mark when Lt. Green—the 12-minute mark when Lt. Green exited the vehicle, Your Honor. Okay. And I think the case here that's closest factually— After the defendant provided consent at approximately the 15-minute mark. But importantly, before he did the density test, they lowered that tailgate, and they can see visibly what they could see before because of the obscured reflective tape, that it didn't line up. So they could tell that it had been cut and re-welded, and Lt. Green testified that he observed Bondo dust on the new welds on the back of that trailer. And that in his experience, Bondo dust suggests that a vehicle has been altered, and they put Bondo on it, and they sand it down to make it look like metal, and they paint over it, which is exactly what happened here. Let me ask you about consent. The consent was given at the 14-58 mark. Judge Dick thought the consent was ineffective. But let's move with it being effective. It seems to me that at the 16-minute mark and some change, there's an arrest. These handcuffs are put on him. He's given Miranda warnings. You can certainly restrain someone who's on an investigation, Terry Stopp or whatever else, but once you put the handcuffs on him and give him Miranda warnings, it seems to me that you have gone to the level of an actual arrest. It seems to me at that stage the idea that it's still a consensual search, that he's got any right to withdraw his consent, is very questionable. After giving you that predicate, is it your position that consent takes you all the way? No, Your Honor. You've taken the trailer away from the highway to wherever it was taken to do the more intensive search? Well, Your Honor, the defendant did never withdraw his consent. Well, he was in handcuffs, and he was given Miranda warnings. I don't know what right somebody reasonably would think he would have to withdraw consent at that stage. You don't have to tell me that he has the right to withdraw consent, but if you do things that suggest to him he can't withdraw, it seems to me that's a factor. That would be true, Your Honor, except that the modifications at that point, the government's position equated to probable cause. Okay. So you're not saying consent is necessary beyond the time that he was handcuffed? Your Honor, once that tail – our position is once the tailgate is down and the density meter is used, probable cause absolutely exists. Lieutenant Green sees the bond of dust. He confirms his suspicions. And he determines that there are anomalies in the trailer bed. But when you look at the district court's opinion and you look at the defendant's brief, they're doing exactly what the Supreme Court tells us not to do, which is a divide-and-conquer analysis, where you look at each individual fact by itself and say, well, that's innocent and that's innocent and that's innocent and that's innocent and that's innocent. But what we have here are trained and experienced officers who look at what I might find innocent and what the district court might find innocent but say, hey, I'm out here on the road performing thousands of traffic stops over the course of my career. And while this may appear in and of itself innocent, but under a totality of the circumstances, I am suspicious that criminal activity is ongoing. Thank you, gentlemen. All right. We thank both sides for your presentation. We'll take this to a center of advisement. Next case of the morning, Martha Canaro.